JUDGE DUVALL
delivered the opinion of the court:
This action, as originally brought, was in the name of Woodcock alone, who claimed to be the owner of five slaves, which, being in the possession of the defendant, were by him sold and converted to his own use, and the plaintiff prayed judgment for $2,000, the alleged value of the slaves at the time of the conversion. Luring the trial, the petition was so amended, at the instance of the plaintiff, as to make White a co-plaintiff.
Farrell answered, setting up the following matters of defense: That the plaintiffs came to his house about the 2d of June, *439 1857, and he agreed with Woodcock to sell him the five slaves sued for (the defendant being the owner of them) at the price of $1,337 50, and gave to Woodcock a memorandum thereof in writing, which the latter is called on to produce; that none of the purchase money was paid, but by the terms of the sale, all the purchase money was to be paid on delivery of the slaves; that one of the slaves had then just recovered from measles, and as it was not known whether the other slaves would have that disease, defendant agreed to keep them until it could be known that they would have passed through that disease, and the plaintiff was then to come and get them and pay for them at the defendant’s house; if, before this event was settled, or before delivery, either of the negroes died, the loss was defendant’s. That on the 6th July, 1857, defendant saw White, who was a partner in the purchase, and it was then agreed that the negroes should be delivered on the 18th of that month; Woodcoek did not come on that day, although White had written to him to come and receive the negroes, but White himself came to defendant’s house, said he had no money, and did not pay for or take the negroes; that the defendant, thereupon, on the same day, (the 18th,) mailed a letter to Woodcock to come on the 24th July and comply with their contract, and pay for and take the negroes; but he failed to come, or to send any word to the defendant, and never paid or tendered any pay for the slaves; and defendant, supposing from the conduct of the parties and their failure to comply as stated, that they had disaffirmed the contract, sold two of the negroes on the 17th August following, and the other three on the succeedingT2th of September.
The memorandum referred to in the answer was produced by the plaintiffs, and is in the following words: “ For the sum of thirteen hundred and thirty-seven dollars and fifty cents, I have sold to R. Woodcock five negroes, one named Delila, aged 38 years old, one named Jane, aged 8 years old, one named Bill, 6 years old, one named George Ann, 3 years old, one named Belle, 1 year old, for which I warrant the above named negroes sound in body and mind, and slaves for life; also warrant the title good, this 2d day of June, 1857. Daniel Farrell.” ,
*440 Upon the trial, the facts stated in the answer, except as to the alleged agreement made with White on the 6th July, were fully sustained by the proof, and there was a verdict and judgment for the defendant; to reverse which the plaintiffs have appealed.
The objection chiefly relied on by the appellants is, that the eourt below improperly admitted the proof establishing the parol agreement relied upon by the appellee.
That the terms of a written contract cannot be varied or contradicted by parol testimony, is a principle not to be questioned at this day, and we concur with the counsel for the appellants in what they say of the policy of adhering strictly to this conservative principle. Has it been violated in this Case ?
The bill of sale contains nothing more than a recital of the fact that Farrell had sold the slaves to Woodcock; a recital of the number, the names and the ages of the slaves sold; and a covenant of warranty, both as to soundness and title. It is, however, entirely silent as to the time and manner of payment by the vendees, and as to the time and place of delivery; and it is to these points exclusively that the verbal agreement relates. The written contract, therefore, is neither contradicted, varied* or explained by the cotemporaneous verbal contract. They are perfectly consistent with each other, and contain stipulations which, although they relate to the same subject-matter, are wholly distinct. It follows that the general principle referred to was in no respect violated in the admission of the parol proof by which the verbal agreement was established.
But it is insisted that the contract in this case was executed; that the written bill of sale passed the title of the slaves to the purchasers, if not the immediate right of possession, and that the subsequent sale and delivery of the slaves by Farrell, before the happening of the contingency upon which the purchasers were bound to pay for and take possession of the slaves, was a conversion by Farrell, which gave the plaintiffs a good cause of action against him.
The argument seems to concede that if the sale of the slaves by Farrell was not made until after the happening of the con *441 tingency referred to, the act of Farrell did not amount to a conversion, or render him liable to the action of the plaintiffs. And such is undoubtedly the law. The principle deducible from the various adjudged cases upon this subject, is thus stated by Chitty in his work on Contracts, (p. 426 :)
“We have already seen that where there is a sale of goods, and nothing is specified as to delivery or payment, although every thing may have been done so as to divest the property out of the vendor, and so as to throw upon the vendee all risk attendant upon the goods, still there results to the vendor, out of the original contract, a right to retain the goods until payment of the price, and that the non-payment of the price will, in some instances, entitle the vendor to dissolve the contract. Though the vendor may have a right to retain the goods until payment of the price, still, after earnest given, he cannot sell them to another without a default in the vendee; and, therefore, if the vendee do not come and pay for and take away the goods in a convenient time, the agreement is dissolved, and the vendor is at liberty to sell them to any other person.” Numerous authorities to this point are referred to in a note.
This principle applies with peculiar force to the facts of the case under consideration, and is decisive of the only material question arising upon those facts. Here, all the risks attendant upon the property sold were, by the terms of the agreement, thrown upon the vendor, and upon that ground, the vendees should have been held to a prompt compliance with the obligations it imposed upon them.
The only remaining inquiry, then, is, whether, upon the pleadings and proofs, there appears to have been such default on the part of the vendees as authorized the vendor to regard the contract as dissolved or disaffirmed, and to dispose of the slaves by a sale to other persons.
That portion of the answer in which the defendant undertakes to assign the breach of the alleged verbal agreement by the plaintiffs, is certainly not as specific or precise as it might have been; but we are not prepared to say that the averments were insufficient, either to authorize the testimony upon that point, or the instruction which the court seems to have based *442 upon it. It is alleged that on the 6th July one of the plaintiffs agreed to pay for and receive the slaves on the 18th, and was at the defendant’s on the day last named, but did not pay for or take possession of the slaves, because he had not the money; that the defendant thereupon notified the other plaintiff, in writing, to come on the 24th of the month and comply with their contract by paying for the slaves and taking possession of them.
There is no contradiction or even contrariety in the testimony, and it is therefore conclusive as to all the material facts. It is proved that none of the slaves had the measles after the 2d day of June; that White was at the defendant’s house on the 18th, examined the negroes, all of whom were well except one which White thought had worms, and he declined to take them — not because they were unsound, or because they had not passed through the disease mentioned, but simply and only because he had not the money to pay for them; that on the same day a letter was addressed and mailed to Woodcoek, notifying him that he must come and receive and pay for the slaves on the 24th; but he failed to do so, and that neither he nor his co-plaintiff, White, at any time afterwards, ever offered in any manner to comply with the contract; and that on the 17th of August following the defendant sold two of the slaves, and sold the remaining three on the 13th September.
Upon this evidence the court instructed the jury, in substance, that if the slaves were, by the agreement, to be delivered at the defendant’s house at a time when they had passed through the measles, and that the plaintiffs were then to come and receive and pay for them; and that after the slaves had passed through that disease, and the plaintiffs were notified of that fact, they (the plaintiffs) did not, within a reasonable time after such notification, come and get them and pay for them, but failed and refused to do so, they must find for the defendant.
Nothing further need be said to show that this instruction is in strict conformity with the facts as proved, and with the principles of law applicable to them. The question then arises, was there such a substantial variance between the allegations *443 and proof as to authorize a reversal of the judgment by this court on that ground alone ?
A satisfactory answer to this question is to be found in those provisions of the Civil Code which relate to “mistakes in pleadings and amendments,” (sections 156 to 166.)
By section 156 it is declared that “no variance between the allegation in the pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice, in maintaining his action or defense upon the merits.” And upon the party’s showing this fact, and also showing in what respect he has been misled, the court may order the pleading to be amended upon such terms as may be just.
Where the variance is not material, as provided in the last section, the court may direct the fact to be found according to the evidence, and may order an immediate amendment without costs. (Section 157.)
And the court may at any time, in furtherance of justice, and on such terms as may be proper, amend any pleading or proceeding by conforming the pleading to the proof, provided such amendment does not change substantially the claim or defense. “ The court must, in every stage of an action, disregard any error or defect in the proceedings which does not affect the substantial rights of the party, and no judgment shall be reversed or affected by reason of such error or defect.” (,Section 161.)
It is by no means clear, as already intimated, that there is any real variance between the facts alleged in the answer and the proof. But conceding that such variance does exist, will it be pretended that it is such as was calculated to mislead the plaintiffs in maintaining their action, or in anywise to affect or prejudice their substantial rights ? Can it be doubted that if the variance now complained of had been suggested at any time during the trial, the court below would have corrected the immaterial error by so amending the pleading as to make it conform to the state of fact made out by the evidence ? It is the obvious policy and spirit of the provisions of the Code referred to, and of numerous other similar provisions, that errors of this class should not constitute a ground of reversal *444 •here, unless an unavailing effort had been made for their correction in the court below. The wisdom of this policy none will question.
The vei'dict and judgment are clearly sustained by the proof; the justice of the case has been fairly arrived at, and the errors, if any exist, are technical and immaterial, and afford no legal ground for the interference of this court.
The judgment is therefore affirmed.